IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

NB THE VILLAGE AT GRESHAM LLC,          )
                                        )
                    Plaintiff,          )          TC-MD 120515D
                                        )
        v.                              )
                                        )
MULTNOMAH COUNTY ASSESSOR,              )
                                        )
                    Defendant.          )          **DECISION**

Plaintiff appeals the 2011-12 real market value of property identified as 248 tax accounts[1]

(subject property) consisting of individual units and garages.  A trial was held in the Oregon Tax

Courtroom, Salem, Oregon, on Monday, March 4, 2013.  W. Scott Phinney, Attorney at Law,

appeared on behalf of Plaintiff.  Rick Bean (Bean), a broker for Rose City Commercial Real

Estate, and Mona St. Clair (St. Clair), real estate agent specializing in residential real estate sales,

testified on behalf of Plaintiff.  Lindsay Kandra, Multnomah County Assistant County Counsel,

appeared on behalf of Defendant.  Barry Dayton (Dayton), registered appraiser, testified on

behalf of Defendant.

Plaintiff's Motion to Exclude Defendant's Exhibits and Related Testimony and

Certificate of Service (Motion), filed March 1, 2013, was not opposed by Defendant.  Plaintiff's

Motion was granted.

Plaintiff's Exhibit 1 (pages 1 through 53 and P1 through P18) and Defendant's Rebuttal

Exhibit B (pages 1 through 7) were received without objection.  A portion of Defendant's

Rebuttal Exhibit A (pages 1, 3, 5, and 7) and Defendant's Rebuttal Exhibit F were received with

Plaintiff's objection.  Defendant's Rebuttal Exhibit C was received without objection, noting that

_____

[1] Plaintiff's Complaint at Exhibit A lists each of the tax accounts appealed, real market tax roll value and requested real market value.

those listings that did not include a tax account referenced in Plaintiff's Complaint were not admitted.

## I. STATEMENT OF FACTS

Bean described the subject property as "124 Condominiums operated as an apartment" with each unit sharing a double car garage. (Ptf's Ex 1.) He stated that there are "38 Buildings (four-plexes)" built in the mid-1970s and "[e]ach four-plex has one downstairs flat, one upstairs flat, and two townhouses." (*Id*.) Dayton testified that there are "three different floor plans." Bean testified that he visited the subject property "six or eight times," taking interior and exterior photographs and noting that the three or four units he inspected had "[o]riginal fixtures, cabinets, counters, ["aluminum single-pane"] windows, baseboard heat[,]" the pool does not have a working heater, there is no net on the tennis court, "[m]ost units do not have washer/dryer hookups[,]" and there was evidence of dry rot on some of the exterior walls. (*Cf. Id*.) Defendant disputed that all the units have "original fixtures," submitting real estate multiple listings during 2007, 2008, 2011 and 2012 for various units, stating that the units were "remodeled." (Def's Rebuttal Ex C exclusive of those listings that omitted a tax account number.) In response to Defendant's questions, Bean testified that each "unit" pays a monthly home owner association fee. He testified that even though he did not observe "any gang signs, tagging, or graffiti," there was one unit where the door was boarded because there "had been squatters," and in his opinion the subject property is located in a "high crime area." St. Clair agreed with Bean, testifying that the subject property is not "in an ideal location," because it is surrounded by commercial businesses, "backs up to a busy road" and the subject property is "not going to appreciate" in value. Dayton testified that he disagrees that the subject property is in "fair to poor condition;" he concluded that the subject property was in "average condition."

Bean concluded that the subject property's highest and best developed use "was as an apartment" and "if redeveloped, as an apartment definitely at a higher density than the current 11.5 units per acre." The parties agreed that the subject property is platted for condominiums. Bean testified that the subject property can "economically operate as an apartment" and investors would not invest in condominiums unless the "internal rate of return" met their requirements.

Bean testified that the "property sold for $6,200,000 in March of 2011" in an arm's length transaction. (Ptf's Ex 1 at 1.) Plaintiff requested a real market value based on the purchase price or "$50,000 per unit." (*Id*.) Bean acknowledged that the subject property was "advertised for sale as a bulk sale" and he testified that he did not know why one of the original buyers "assigned" its "rights, title and interest in and to the Agreement to NB Village." (Ptf's Ex 1 at 31.) Dayton testified that "bulk sale pricing" results in a lower price than if the units were sold "individually."

Both parties agreed that given the subject property's year built (mid-1970s), the cost approach is not applicable. Bean testified that because the subject property has a "hybrid use" (there are 28 condominium units and 124 apartments in the same complex), he "did not find a whole lot of data" for a comparable sales approach.

Bean testified that he used the income approach to "ascertain if the subject property sold at market price" and "to verify that the sale price made sense." He testified that he obtained financial data from Riverstone Property Management for the period after the sale closed through the end of 2011; he testified that he annualized the "10 month data" and determined "an indicated value for 2011-12" of "$6,100,000" rounded. (Ptf's Ex 1 at 40 through 46.) In response to questions, Bean confirmed that he did not have "a rent roll for this property," he did not attempt to get "data for other years," he had no knowledge of the actual vacancy rate, and he

was not able to "reconstruct how he determined other income." Bean testified that he determined a capitalization rate of 7.5 percent, relying on "cap rates" he computed based on apartment sales in southeast Portland, Multnomah County and Clackamas County reported in "CoStar" and "LoopNet" and in the "CAP Rate Ranges" stated in a Norris & Stevens Apartment Investors Journal. (Ptf's Ex 1 at 48-49, 51.) In response to questions, Bean testified that the "apartment sale data" were not "gathered" for "this appeal," stating that he prepared the "data" for "another tax case." Bean testified that none of the "apartment sales" was "hybrid." Defendant questioned Bean about the characteristics of the apartments selected, specifically regarding number of units, unit size, year built, and amenities. (Ptf's Exs 48-49.)

St. Clair testified that she determined a "broker's opinion of value" for each unit, ranging from $50,000 to $55,000. (Ptf's Ex 1 at 53.) She testified that two of the seven properties she identified as comparable to the subject property were sales of condominium properties located in the subject property's complex. (*Id*.) Those two properties were similar in size to the subject property and same year built; sale dates were January 28, 2011, and June 3, 2011, with reported sale prices of $54,000 and $62,000, respectively. (*Id*.) St. Clair testified that the second property had been "remodeled" and in her opinion "remodeled units sell for more." St. Clair was asked why she did not include a June 18, 2010, sale of a condominium unit in the same complex that sold for $110,000. (Def's Rebuttal Ex F.) She responded, stating that she did not consider that property comparable, did not know if it was an arm's length transaction, and noted that the buyer may have been willing to pay more because the listing stated that the seller agreed to "Contribute 3% of the Sales Price Towards Buyer's Closing Costs." (*Id*. at 1.) In response to questions, St. Clair testified that many of the comparable properties were bank-owned at the time of sale but

/ / /

she determined that "to be the market."  Dayton testified that he considers the sale of a "bank-owned property" to be a "distress sale."

## II.  ANALYSIS

The issue before the court is the subject property's real market value as of January 1, 2011.  In Oregon, all real property "not exempt from ad valorem property taxation or subject to special assessment shall be valued at 100 percent of its real market value." ORS 308.232.  ORS 308.205(1)[2] defines real market value:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

A.     *Purchase Price*

When determining real market value, a recent voluntary, arm's-length sale of a property between a willing and knowledgeable buyer and seller is very persuasive of real market value. *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973); *see also Sabin v. Dept. of Rev.*, 270 Or 422, 426-27, 528 P2d 69 (1974); *Equity Land Res. v. Dept. of Rev.*, 268 Or 410, 414-15, 521 P2d 324 (1974).  The parties acknowledge that the subject property was offered for sale as a "bulk sale of 124 [condominium] units to one buyer."  (Ptf's Ex 1 at 2.)  In a recent decision, *Seaside Investments LLC v. Clatsop County Assessor* (*Rivertide Suites*), TC No 4966 at 3 (Jan 28, 2013), this court held that it is a "legal requirement" that "each individual unit in the condominium and not the aggregate of the units" be valued.  The court stated:

/ / /

/ / /

---

[2] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2011.

DECISION  TC-MD 120515D                                                                                    5

> "When valuing such individual units, an authoritative source for the appraisal industry recognizes that individual units should not be valued by valuing the entire project and then allocating total value to individual units."

*Id*. at 5 (citing Appraisal Institute, *The Appraisal of Real Estate* 639 (13th ed 2008)).

Plaintiff's requested real market value is based on a total purchase price of $6,200,000 divided by 124 units, or $50,000 per unit. The allocation of Plaintiff's purchase price to each unit does not value the individual real market value of each unit and garage. Plaintiff's allocation method is not an acceptable valuation approach.

B.      *Valuation*

Real market value is determined by the particular methods and procedures adopted by the Department of Revenue. *See* ORS 308.205(2). There are three approaches to valuation (income, cost, and sales comparison) that must be considered when determining the real market value of a property. OAR 150-308.205-(A)(2)(a); *cf. Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995). The valuation approach to be used is a question of fact to be determined on the record. *Pacific Power and Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979).

Both parties agreed that the cost approach is not applicable to this case.

Plaintiff presented a modified income approach. In *Seaside Investments*, the court noted that "*The Appraisal of Real Estate* recognizes that the income indicator can be used in valuing an entire project but that valuation of individual units is a different and distinct assignment[,]" and the court questioned "how project income and expense could reliably be assigned to individual units." *Seaside Investments,* TC 4966 at 7.

In this case, Plaintiff used the income approach to the value of the entire 124 units and allocated the value among the individual units. Like the allocation of the purchase price, the

/ / /

ratable allocation of the entire value of the subject determined by the income approach to each unit is not an acceptable valuation approach for individual condominium units.

In a case such as this one before the court, the comparables sales approach may be used to value improved properties. *Chambers Management Corp v. Lane County Assessor*, TC-MD No 060354D, WL 1068455 at *3 (April 3, 2007) (citing Appraisal Institute, *The Appraisal of Real Estate* 335 (12th ed 2001)). The Department of Revenue adopted OAR 150-308.205-(A)(2)(c), stating, in pertinent part, that "[i]n utilizing the sales comparison approach[,] only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

As the party seeking affirmative relief, Plaintiff bears the burden of proving that his subject property's real market value is incorrect on the tax roll. ORS 305.427. Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 at *2 (July 12, 2001) (citing *Feves v. Dept. of Rev.*, 4 OTR 302 (1971)). Plaintiff must present the greater weight of evidence to support his requested real market value reduction. This court has stated that "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted)). Competent evidence includes "appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real

/ / /

/ / /

estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D at 7 (March 13, 2012). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.* (*Reed*)*,* 310 Or 260, 265, 798 P2d 235 (1990).

In the case before the court, Plaintiff did not present a comparable sales approach. Plaintiff relied on a broker's opinion of value. The broker made no adjustments (e.g., time, size, age, location) to the sale price of any of the seven properties to make those properties comparable to the subject property. (*See* Ptf's Ex 1 at 53.) There was no evidence that the broker verified the reported sales. Two of the seven properties were located in the subject property's complex and the adjusted sale prices of those properties were more than Plaintiff's requested value for each unit. Plaintiff offered no evidence why those two sales should not be given the most weight. Plaintiff offered no evidence why the real market value of each unit should be the same even though there are three different plans for the subject property's condominium units. Plaintiff's requested real market value does not separately state the real market of each tax account appealed; it combines the condominium unit and garage even though each is assigned a separate tax account.

Plaintiff's evidence in support of its requested real market value reduction is inconclusive. When the "evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof." *Reed*, 310 Or at 265. Plaintiff failed to carry its burden of proof.

III. CONCLUSION

After careful review of the testimony and evidence, the court concludes that Plaintiff failed to carry its burden of proof. Plaintiff's reliance on a bulk sale purchase price for the 124 individual condominium units and a modified income approach that determined an indicated

/ / /

value for the entire 124 units rather than each unit are not acceptable valuation methods.

Plaintiff's broker's opinion of value is inconclusive. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ____ day of April 2013.


JILL A. TANNER
PRESIDING MAGISTRATE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Presiding Magistrate Jill A. Tanner on April 29, 2013. The Court filed and entered this Decision on April 29, 2013.*